[Cite as *In re J.B.*, 2013-Ohio-5727.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: J.B.

C.A. No.     27037

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN11-02-0109

DECISION AND JOURNAL ENTRY

Dated: December 26, 2013

MOORE, Presiding Judge.

{¶1}    Appellant, Angela B. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, J.B., and placed him in the permanent custody of Summit County Children Services ("CSB"). This Court affirms.

I.

{¶2}    Mother is the parent of J.B., born September 25, 2002, whose custody is the subject of this appeal. No man claiming to be the father of J.B. has appealed. Mother's two other children, F.B., born August 2, 2005, and J.G., born February 29, 2008, are not parties to this appeal. In a separate action and with the agreement of Mother, those two children were placed in the legal custody of their biological father, S.G., with an order of protective supervision to CSB.

{¶3} When the present action began, all three children resided with Mother. When CSB received a report that F.B. had been physically abused, they sent investigators to the home. While CSB did not find evidence of abuse, Mother purportedly told them that J.B. had harmed F.B. and further reported that J.B. had engaged in other aggressive behaviors. Mother later testified that she asked the agency to keep the case open for services.

{¶4} On February 16, 2011, CSB filed a complaint in juvenile court, alleging that the children were dependent and seeking protective supervision by the agency. At the ensuing hearings, Mother stipulated to dependency and agreed to the dispositional order of protective supervision.

{¶5} Over the next few months, Mother reportedly made some progress on her case plan and, on December 29, 2011, CSB moved to terminate protective supervision in anticipation that the case might soon be closed. Approximately one month later, however, the guardian ad litem filed a motion to remove the children from the home and place them in the emergency temporary custody of the agency. CSB joined in the motion. The motion alleged that the house was in disarray. There were clothes thrown everywhere, dog feces in the upstairs bedrooms, and no beds for the children. It also alleged that the two older children had poor school attendance and often wore inappropriate or dirty clothing. The guardian ad litem later explained that the younger children were wearing Mother's or J.B.'s clothing. She added that Mother had not been submitting the drug screens required by her case plan and she was attending only half of her counseling appointments. There was no refrigerator in the home; the family was using a cooler. Essentially, the movants determined that the same issues that existed prior to the case being opened, still existed, plus a dog was added to the household. The court granted emergency temporary custody of the children to the agency on February 2, 2012.

**{¶6}** Mother's reunification case plan required her to obtain and maintain safe, stable housing; address her mental health, substance abuse, and medical needs; ensure that children attend school or daycare regularly; demonstrate an ability to access and utilize services; and provide for the basic needs of her family.

**{¶7}** On October 9, 2012, CSB moved for permanent custody. Following a hearing in June 2013, the trial court granted the motion. Mother appeals and assigns one error for review.

II.

## ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED WHEN IT RULED THAT PERMANENT
CUSTODY WAS IN THE BEST INTEREST OF J.B. AND WAS AGAINST
THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶8}** Mother contends the weight of the evidence does not support the trial court finding that permanent custody was in the best interest of the child. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

**{¶9}** The trial court found that the first prong of the permanent custody test was satisfied because J.B.'s father had abandoned him and J.B. could not or should not be returned to Mother's care. *See* R.C. 2151.414(B)(1)(b) and R.C. 2151.414(B)(1)(a). In making the latter

determination, the court found that Mother had failed to remedy the conditions that brought J.B. into care. *See* R.C. 2151.414(E)(1). Specifically, the court found that Mother failed to engage in meaningful substance abuse and mental health treatment. As a result, Mother has difficulty caring for herself, let alone a young child. On appeal, Mother does not contest the first prong finding, but rather challenges the finding that permanent custody is in the best interest of the child.

{¶10} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his life. *See In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

1. Interaction and interrelationships of the child.

{¶11} Consideration of the first best interest factor focuses attention on the interactions and relationships of J.B. with his siblings and Mother. At the start of this case, J.B. was displaying behavioral problems both at home and at school. He was refusing to participate in school activities, being aggressive with his siblings, exposing himself to neighbors, and setting fires. J.B.'s therapist, Carrie Schnirring, explained that J.B. had been diagnosed with a mood disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder based on adverse childhood experiences. Those experiences affected his ability to relate to others socially

and emotionally. Because of the trauma and stress he had confronted in his life, she believed J.B. might need trauma-based counseling.

{¶12} For her part, Mother was diagnosed with mood disorder, anxiety, substance abuse, depression, bi-polar disorder, and post-traumatic stress disorder. Her treatment goals were to attempt to decrease depression and anxiety, improve communication and memory issues, and address anger, mood difficulty, and lack of motivation.

{¶13} The testimony is undisputed that J.B. and Mother share a bond. J.B. looked forward to Mother's visits and craved her attention. He was said to be very loyal to and protective of Mother. In her own testimony, Mother expressed love for her son and a desire for his return. They demonstrated their affection with hugs.

{¶14} Ms. Schnirring was enlisted to conduct a psychological evaluation of J.B. and his siblings for the purpose of identifying the extent of the relationship between the children. No evaluation was conducted regarding J.B.'s relationship with Mother because the agency had no doubt that they loved each other. Ms. Schnirring determined that J.B. does share a bond with his siblings, but she characterized that bond as "brittle," by which she meant that the children tended to interact in negative ways. The caseworker similarly described the sibling relationship as "stressed."

{¶15} Despite their challenged relationships, Ms. Schnirring advocated continued contact between the siblings, even if permanent custody is granted. While the counselor could not predict the effect on J.B. of a separation from his siblings, she believed that the more significant issue is the type of caregiver J.B. has. If he has a caregiver that provides supervision, consistency, and predictability as well as someone with the time and energy to teach him better behaviors, he will do better himself. In addition, if his caregiver is able to facilitate a

relationship between the siblings to preserve whatever affection they share, the siblings might potentially benefit from those relationships later in life. In any case, she recommended counseling.

{¶16} There is no evidence of any relationship between J.B. and his legal father, Ian W., or the subsequently alleged father, Tion M. Neither man participated in the permanent custody hearing.

{¶17} J.B. has a good relationship with his foster parents. The home is very structured and successfully utilizes behavior reward charts for motivation. There are no other children in the home, and a foster grandmother provides additional support. J.B. was said to enjoy the attention he received and had an especially close relationship with the foster father. The current foster parents are interested in adoption if that becomes available. They are also reportedly willing to allow continued contact between J.B. and his siblings. According to the guardian ad litem, J.B.'s behavior has completely turned around since he has been in foster care.

{¶18} Regarding Mother's progress on her reunification objectives, the caseworker felt Mother had not complied with her case plan, but more importantly, she had not internalized the skills and techniques that the service providers sought to convey. As a result, the agency did not believe that Mother could meet the needs of her children.

{¶19} The record demonstrates that Mother's efforts to comply with her mental health objectives were very inconsistent. Mother did well in an exercise-based stress management program for the month prior to the permanent custody hearing, and she also completed ten sessions of an anger management program, although it took her seven months to do so. Otherwise, the record demonstrates that Mother had not been consistent or successful in addressing her mental health objectives. While the children were still in the home, Mother had

very poor compliance with even a 90-day home-based program offered through Beech Brook. Mother was not regularly getting the children to school or J.B. to his appointments. After the children were removed in February 2012, Mother's case at the Community Health Center was closed for lack of attendance. In that program, Mother was being treated for anxiety and was being helped with the management of daily responsibilities. Mother then began counseling at Portage Path. According to Mother, she began with weekly sessions, then every other week, and finally monthly. In a full year, she kept nine appointments.

{¶20} The record similarly reveals that Mother's efforts to comply with recommendations for substance abuse treatment were not only inconsistent, but unsuccessful. Mother was to comply with weekly drug tests and counseling sessions, but her attendance was very inconsistent in 2011 and 2012. She occasionally went as long as three months without completing drug screens. In November 2012, Portage Path found that she tested positive for cocaine. In April 2013, Mother agreed to submit to three drug tests per week and completed 19 of 32 anticipated tests. Eleven of the 19 tests were positive for marijuana. During the last week of May 2013, one month before the permanent custody hearing, Mother tested positive for marijuana in two out of four tests.

{¶21} Regarding the objective of maintaining safe and stable housing, the evidence demonstrates that Mother moved several times during the course of the proceedings and that there were continuing problems with her upkeep of the homes. At the time of the permanent custody hearing, Mother was reportedly staying in an apartment with her sister. The caseworker was not shown a lease or other evidence that she lived there. Mother claimed that her father was helping pay her rent. Also, at the time of the permanent custody hearing, Mother claimed that she worked at a temporary agency, but did not verify the employment.

2. Wishes of the child.

{¶22} In regard to the second best interest factor, J.B. expressed a desire to return to Mother. The guardian ad litem believed that J.B. always held out hope that he would go home with Mother. The guardian ad litem further explained, however, that "within the last couple months, he has gone from adamantly wanting to be with his mom to accepting that this foster placement may be his forever home. He seems pretty comfortable with that. He's just kind of turned on what his position is." J.B.'s wishes were represented by an independent attorney in the trial court.

{¶23} J.B.'s counselor, Ms. Schnirring, offered somewhat corroborating testimony regarding J.B.'s wishes. She stated that J.B. never wavered from saying he wanted to be reunited with Mother. However, when asked to draw a picture of his family, J.B. drew his foster family. From that, Ms. Schnirring concluded that J.B. may be a little more hesitant about his expressed wish to return to Mother.

{¶24} The guardian ad litem testified that she believes permanent custody is in J.B.'s best interest, but she also believes that J.B. should maintain contact with Mother and his siblings if possible. She explained that J.B. has begun to show some affection towards his siblings and there has recently been some positive interaction among them. She stated that the foster parents as well as the biological father of the siblings were amenable to that.

3. Custodial history

{¶25} The custodial history of J.B. reveals that he has been in the custody of CSB three times in his life. He was previously in the custody of the agency from July 20, 2004 until July 18, 2006, and from August 21, 2009 until September 29, 2009. In the present case, J.B. was removed from the home and placed in temporary custody on February 2, 2012 until the

permanent custody hearing in June 2013. That amounts to nearly three and one-half years of temporary custody for this ten-year-old child. In June 2013, the two younger children were placed in their father's home.

4. The child's need for permanence

**{¶26}** As to the fourth best interest factor, there was evidence before the trial court that J.B. was in need of the legally secure placement that he had always lacked. The caseworker investigated several friends and relatives and also utilized the child center recruiter, but was not successful in locating anyone who was willing and able to provide suitable care for J.B. Mother suggested that placement with paternal aunt Janie Tyson would be a less restrictive option. The caseworker testified that Ms. Tyson was considered, but that she was unable to assume custody for personal reasons and was in the process of moving out of state.

**{¶27}** The guardian ad litem concluded that permanent custody was in the best interest of J.B., despite concerns that he might not see Mother or his siblings again. The guardian ad litem did not believe there is anything short of permanent custody that would be in J.B.'s best interest.

**{¶28}** During her testimony, the guardian ad litem was questioned about the impact on J.B. if contact with Mother were terminated and he learned that his siblings were still having contact with her. She explained that he would have some difficulty, but either way, he would adjust. He has love and support in his foster home and is also in therapy. Therefore, if contact with Mother were ended, J.B. has the support to still be a stable, normal, happy child. She acknowledged that permanent custody is always difficult for children and J.B. would require ongoing therapy.

{¶29} On her own behalf, Mother testified that she loved her son and wanted him to be returned to her care. In her direct testimony, she claimed that she had stable housing, sufficient food and clothing, and that the children attended school regularly when CSB first became involved. On cross-examination, however, she had to agree that the children had many unexcused absences from school. Other witnesses testified to the very poor condition of her home as well as the children's clothing and hygiene. Mother claimed she complied with drug screens three times a week, but on cross-examination, changed her contention to "as much as I could." Mother also claimed she did not know what she was supposed to do on her case plan until the second case worker was assigned late in the proceedings. The guardian ad litem testified that she and the first caseworker carefully went over the case plan with Mother shortly after the children were removed, and repeatedly reiterated her obligations, including giving her parenting advice during visitations. Nevertheless, despite these explanations, the guardian ad litem believed that Mother did not appear to understand that a lack of case plan compliance would affect reunification.

{¶30} On appeal, Mother asserts that although she was overwhelmed with caring for three children, she was never given the opportunity to parent just J.B. From the record, it appears that J.B. was by far the most challenging child of the three. It also appears that he has done much better while in very structured foster placements. In addition, CSB points out that because Mother was pregnant with yet a fourth child, there would soon be another child in the home.

{¶31} Testimony regarding Mother's parenting skill disputes her ability to parent even one child. Mother would occasionally make promises to J.B., but then would not keep her word. According to the caseworker, Mother failed to plan activities for the children and generally left

them to their own devices at home and at visits. She demonstrated no parental authority and was not able to control the children. The caseworker believed that Mother's failure to provide guidance to the children, resulted in J.B.'s attempts to be responsible for them and his parentification.

{¶32} J.B.'s counselor, Ms. Schnirring, further explained that while J.B. felt responsible for his siblings, he lacked the coping skills necessary for the management of normal sibling rivalries. Instead, he used anger and aggression in his attempts to manage them. The result was a great deal of negative behavior. According to Ms. Schnirring, the children's behavior suggests that Mother was never able to teach her children to interact in healthy ways.

{¶33} Finally, Mother asserts that efforts to maintain a sibling relationship were stifled by the fact that J.B.'s siblings were placed in the legal custody of S.G., a man that had physically abused J.B. and had a no-contact order in regard to him. Mother understandably wanted no contact with the man that had abused her son, and CSB and the guardian ad litem argued that the sibling relationship would be difficult to foster if J.B. were returned to Mother because of those feelings. However, Mother had agreed to the placement of the two children in the legal custody of their father. Furthermore, the sibling relationship was properly considered by the trial judge as part of the first best interest factor, as it should be. *See In re T.R.,* 9th Dist. Summit Nos. 25179 and 25213, 2010-Ohio-2431, ¶ 19.

{¶34} Unquestionably, the relationships in this case are complicated and the wishes of the child as well as the opinions of the relevant service providers are not as simple and straight-forward as they might be. Whether J.B. remains with Mother or is adopted following an order of permanent custody, safe visits between the children - if agreed to at all - may be difficult to arrange, but are not impossible.

{¶35} It is appropriate to recognize, as the trial court did, that this is the third time Mother has had her children removed from her care. Moreover, the guardian ad litem emphasized that she and the caseworker worked very diligently to try to keep J.B. in the home with Mother as long as possible, in part because J.B. had difficulty maintaining in a foster home in 2009. After the children were removed, Mother's efforts towards case plan compliance were inconsistent and ineffective.

{¶36} Upon consideration of the entire record, we conclude that there was ample evidence before the trial court from which it could conclude that permanent custody was in the child's best interest. Consequently, the trial court did not err in terminating Mother's parental rights and placing J.B. in the permanent custody of CSB. Mother's sole assignment of error is overruled.

III.

{¶37} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

MADELINE LEPIDI-CARINO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

LINDA SELL, Attorney at Law, for J.B.

JOSEPH KERNAN, Guardian at Litem.